WILLARD v. MOYE.

4-6502                                      156 S. W. 2d 202

Opinion delivered December 1, 1941.

*Pickens & Pickens,* for appellant.

*J. E. Lightle, Jr.,* for appellee.

MEHAFFY, J.   The appellants, W. E. Willard and Vernon Willard, residents of Jackson county, Arkansas, brought suit in White county circuit court against J. F. Moye and O. J. Young, doing business under the name of Moye & Young. They alleged in their complaint that on March 18, 1940, they traded to appellees a team of mules of the value of $250 for a horse and mare, and agreed to give appellees $50 as evidenced by their note of that date; that appellees warranted said horse and mare to be sound and free from shipping colds, but that said horse and mare died within three weeks from said date as a result of shipping colds. The suit was for the value of the mules for a breach of warranty of said horse and mare; that appellants relied on said warranty in the purchase of said horse and mare.

Appellees filed answer denying each and every material allegation of the complaint.

Vernon Willard testified in substance that he was one of the plaintiffs and that he traded for a horse and mare with the firm of Moye & Young at Searcy; that it was either on the 10th or 25th of March; he traded a

team of mules, one of which he had owned about a year, the other about four years; that their value was $250; Tom Moye did the trading and he guaranteed the horse and mare to be sound in every way and over the shipping cold; that he made a $50 note for the difference in the trade; he asked specifically about shipping cold and it was guaranteed that they were over it; the horse died in two weeks and the mare in three weeks; the horse worked a day, the mare hardly an hour after he traded for them; one of the mules was 13 years old and the other 19 years old; one weighed 1,300 pounds and the other 1,200; they were good mules; the only thing physically wrong with them was something wrong with one of the mule's eyes, but witness showed it to Moye when they traded; the eye had been in that condition three or four weeks before the trade; witness went to the mule barn of Has Owens for the purpose of trading said mules, but he could not trade with Owens; witness did not know Tom Moye, but he was told that the one he traded with was Tom Moye and he guaranteed that the horse and mare were free of shipping cold; Mr. J. F. Moye did not make any guarantee and witness had no dealings with Harold Moye or O. J. Young relative to the mules; does not know who comprises the firm Moye & Young; they hooked up the horse and mare in the barn and drove them about two blocks to show they would work; witness did not examine the mare at that time and does not think his brother did for they could not see anything wrong with them at that time and they were guaranteed; witness is sure that the man he traded with said they were over the shipping cold; after witness bought the team he took them to Possum Grape in Jackson county where witness then lived; does not remember how many days later he called Dr. Gustafson to see them; the mare was sick next morning and on Wednesday the horse got sick; on Thursday or Friday they called the doctor; they worked the horse about half a day and the mare did not have the harness on over half an hour; they had worked loading logs on a truck; has worked with horses and mules all his life; never knew much about shipping cold; noticed whether or not the mare and horse had shipping colds

when he took them home; worked the horse a little after he noticed that they had shipping colds; it was raining part of the time; kept the mare and horse in a shed when it was raining; part of the time it was cold; one died in two weeks and the other in three after witness traded for them; during that time they were kept in the shed unless the weather was pretty; Dr. Gustafson made one trip to see the animals; witness notified the seller a few days after the horse and mare died.

It was agreed by counsel that Tom Moye had a right to deal in behalf of J. F. Moye.

Dr. Gustafson testified in substance that he was a veterinarian and lived at Searcy; (his qualifications were admitted) he was called in March, 1941, to see the team belonging to appellants; he examined the team, composed of a horse and a mare, and found one suffering with pneumonia in the last stages; the other had what is generally termed shipping fever; does not remember the exact date on which he was called; the horse and mare were in a lot, a logging camp; they had an enclosure covered with a tarpaulin or wagon sheet; examined the horse and mare in the small enclosure which was just a temporary shelter; he would not say it was sufficient shelter for a horse and mare in the condition in which he found them; the lot was muddy, but it was not so cold; stock in the average mule barn are all subject to shipping cold, for it is practically impossible for one to go through a mule barn and not have it; that is generally known in the mule trading business; horses are more susceptible to colds than mules; pneumonia sometimes follows a shipping cold; after the disease is discovered no medical treatment is of any value and they should be kept as comfortable as possible, away from air and well fed; should be kept in a dry place as much out of drafts as possible; would be injurious to permit them to walk in a wet lot. The horse and mare in this case were in a canvas shelter on a wet lot, but witness does not think they had been allowed to go into the lot; the only flooring in the shed was straw and hay which was wet; the animals were standing on a wet floor and the shed was not sufficient to protect them in the condition they were in; if the

stock had been well and free from shipping cold, the shed would not have given them shipping cold; if other stock had been permitted to use the shed that had the shipping cold, these animals would have contracted the disease in that place; from the case witness saw that it would take seven to nine days for its development, depending on the susceptibility of the animals.

W. E. Willard, one of the appellants, testified in substance that he now lives in Augusta, but lived on the river out from Possum Grape in March, 1940; was present at the time the trade was made; brought the mules over to trade them; was working in a soft brake and mules could not stand up on the mud, so they traded them for horses which were supposed to be sound and well; witness' brother asked about shipping colds and Moye said they were over the colds and ready to go to work; witness had seen animals with shipping colds before.

Two or three other witnesses testified, but their testimony was substantially the same as that already copied. It would serve no useful purpose to set it out in full.

At the close of the testimony the court instructed the jury to return a verdict in favor of defendants, to which counsel for plaintiffs at the time excepted. The jury returned the following verdict: "We, the jury, find for the defendant, J. F. Moye," upon which verdict the court entered judgment. The case is here on appeal.

This was not a sale of personal property, but was a trade by the appellants of a team of mules for the horse and mare belonging to appellees. The appellants themselves made the trade with Tom Moye, who was an agent with authority to trade in personal property of the appellees.

There is argument by counsel for both parties as to whether Tom Moye had authority to warrant the horse and mare. We deem it unnecessary, however, to discuss the authorities or the principle, for the reason that there is no evidence tending to show that either the horse or mare had shipping colds or any other ailment at the time of the trade. Of course, there is no claim that there was a warranty that the stock would not contract the disease

in the future. Appellants themselves examined the stock and hooked them up, and there is no evidence that either of them had any ailment at the time of the trade.

It is not contended that the appellees warranted the horse and mare had not had shipping colds, but the evidence of appellants is to the effect that they warranted that the horse and mare were over the colds. This necessarily implied that they had had shipping colds, for they could not be said to be "over" an ailment they had not had.

One of the appellants testified that he did not talk to appellees, but only to their agent, and neither of the appellees made any warranty or representation. He testified that they hooked up the horse and mare in the barn before he took them away, and drove them about two blocks. He is sure that Tom Moye said they were over the shipping cold. He did not examine the horse and mare at that time and does not think his brother did, for they could not see anything wrong with them and they were guaranteed. Witness further testified that he had worked horses and mules all his life, and while he never knew much about shipping colds, he would recognize when an animal had shipping cold; he noticed whether or not the mare or horse had any shipping cold when he took them home.

It is true that the evidence shows that one of the animals died in two weeks and the other in three weeks after the trade, and they had been sick for some time before a doctor was sent for. When they became sick appellants did not notify appellees of their condition, and did not notify them of the death of the animals for several days thereafter. The animals were taken by appellants to a logging camp and put into a shed which was covered with tarpaulin, with a floor of wet straw and hay. The evidence shows that keeping the animals in a place of that sort might give them shipping colds, especially if any animal with that disease had been kept there before. The doctor testified that when he was called one of the animals had pneumonia in the last stages and he testified, not that pneumonia would follow shipping cold, but that it might do so.

In construing a contract of warranty the same rules apply as in the construction of other contracts, and it is the duty of the court to ascertain and give effect to the intention of the parties.

"Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. Whatever may be the inaccuracy of expression or the inaptness of the words used in an instrument in a legal view, if the intention of the parties can be clearly discovered, the court will give effect to it and construe the words accordingly. It must not be supposed, however, that an attempt is made to ascertain the actual mental processes of the parties to a particular contract. The law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest. It is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument. This language must be sufficient, when looked at in the light of such facts as the court is entitled to consider, to sustain whatever effect is given to the instrument. Taking into consideration this limitation, it may be said that the object of all rules of interpretation is to arrive at the intention of the parties as it is expressed in the contract. In other words, the object to be attained in interpreting a contract is to ascertain the meaning and intent of the parties as expressed in the language used. Agreements should be liberally construed, so as to give them effect and carry out the intention of the parties. This rule applies to sealed as well as to unsealed writing and to verbal contracts. It is not the real intent but the expressed or apparent intent, which is sought." 12 Am. Jur., 745, *et seq.*; *Dewey Portland Cement Co.* v. *Benton County Lbr. Co.*, 187 Ark. 917, 63 S. W. 2d 649; *Sternberg* v. *Snow-King Baking Powder Co.*, 186 Ark. 1161, 57 S. W. 2d 1057; *Sydeman Bros., Inc.*, v. *Whitlow,* 186 Ark. 937, 56 S. W. 2d 1020; *Missouri & N. A. Rd. Co.* v. *Fowler,* 173 Ark. 772, 293 S. W. 47.

The appellants had an opportunity to inspect, and did inspect, the animals and hooked them up and drove them. One of appellants, in testifying, stated that he had worked with mules and horses all his life and that he would recognize shipping colds in an animal. After this trial of the team, appellants took the animals home and put them in an insufficiently protected enclosure, did not notify appellees when they became sick, and did not notify them until several days after the death of the last one.

We have reached the conclusion that the warranty testified to by appellants meant that the animals at that time were not sick, and neither party understood the warranty to be that they would not contract any disease in the future.

The judgment of the circuit court is affirmed.